IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

   *v.*

BRICE E. ANDERSON

CRIMINAL ACTION NO.
1:25-CR-455-SDG

## Government's Sentencing Memorandum

The United States of America, by and through its counsel, Theodore S. Hertzberg, United States Attorney, and Bernita B. Malloy, Assistant United States Attorney for the Northern District of Georgia, files this Memorandum in preparation for the sentencing of Defendant Brice E. Anderson ("Defendant").

### I. Introduction

On November 13, 2025, Defendant pled guilty to a one-count criminal information charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. (Doc. 10-1).  In the Final Presentence Report ("PSR"), Probation computed Defendant's total offense level to be 15. (PSR ¶ 129).

Starting with a base offense level of 6 for a violation of 18 U.S.C. § 371, Probation added 14 points for a loss amount exceeding $550,000. (PSR ¶¶ 121–122).  Probation then subtracted 3 points for acceptance of responsibility. (PSR ¶ 127).  Probation also subtracted 2 points because Defendant meets the criteria for a Zero-Point Offender. (PSR ¶ 128).

Defendant has no criminal history points, so his criminal history category is I. (PSR ¶ 134).  Defendant's total offense level of 15 and criminal history category of I resulted in a guidelines range of 18 to 24 months. (PSR at p. 38).

Defendant objects to paragraph 124 in the PSR on the ground that he is entitled to a minor role reduction under U.S.S.G. § 3B1.2(b).  As further discussed below, Defendant's objection is unfounded.  Defendant cannot show that he played a minor role in the scheme.  As such, this Court should overrule Defendant's objection.  In addition, for the reasons set forth below, the Government recommends a sentence of 18 months at the low end of the guidelines range and restitution.

## II.   Factual Background

Beginning in or about June 2017 and continuing through June 2021, Defendant engaged in a scheme with his co-conspirator, Furlow-Smiles, to

defraud Facebook by submitting fraudulent purchase orders and invoices through his company, Titan Branding, LLC, for goods and services Defendant did not provide, and by kicking back a substantial portion of the fraudulent proceeds to Furlow-Smiles.  (PSR ¶¶ 16, 18, 23, 34).  Through this scheme, Defendant defrauded Facebook of $1,195,126.07.  (PSR ¶¶ 28, 116).

Furlow-Smiles was the lead strategist, global head of employee resource groups, and head of Diversity, Equity, and Inclusion programs at Facebook from January 2017 until her departure in September 2021.  (PSR ¶ 12).  In her role, she was given company credit cards for legitimate corporate expenses and had the authority to submit purchase orders and approve invoices for authorized vendors of Facebook.  (PSR ¶ 13).  She used that authority to steal more than $4 million from Facebook by causing the company to pay individuals for goods and services that were not provided, and by having those individuals kick back some of the fraudulent proceeds to her.  (PSR ¶ 15).

Defendant met Furlow-Smiles in 2014, when he was an intern for her at Cox Communications in Atlanta, Georgia.  (PSR ¶ 14).  In January 2019, Defendant registered Titan Branding with the Georgia Secretary of State.  (PSR ¶ 14). Beginning in June 2017, Furlow-Smiles used her corporate credit cards to make

payments to Anderson through PayPal, Venmo, and Cash App for goods and services he fraudulently claimed to have provided to Facebook.  (PSR ¶¶ 18, 35). Between June 2017 and December 2019, Defendant received more than $131,000 in payments based on these fraudulent credit card charges.  (PSR ¶ 18).

In January 2020, Furlow-Smiles caused Facebook to approve Titan Branding as a vendor.  (PSR ¶ 21).  Furlow-Smiles then approved purchase requisitions for Titan Branding to order goods and pay for services from Defendant on behalf of Facebook.  (PSR ¶ 22).  After Facebook generated purchase orders, Defendant submitted fraudulent and inflated invoices, which Furlow-Smiles approved for payment.  (PSR ¶¶ 22–23).  Between January 2020 and June 2021, Defendant received more than $1 million from Facebook based on these fraudulent invoices, despite completing only approximately 10 percent of legitimate work for the company.  (PSR ¶¶ 23, 28).

When Defendant received the fraudulent payments, he kicked back substantial sums to Furlow-Smiles.  (PSR ¶ 24).  He paid the kickbacks in cash and through electronic transfers to accounts held by Furlow-Smiles and her husband.  (PSR ¶ 24).  Defendant personally delivered cash kickbacks in person and by FedEx, sometimes wrapping the cash in other items, such as T-shirts or

4

hats.  (PSR ¶ 24).  When Furlow-Smiles was in Los Angeles, California, Defendant flew there with cash and drove with Furlow-Smiles to ATMs and banks to withdraw cash to pay her.  (PSR ¶ 24).  Of the $1,195,126.07 Defendant received from Facebook, he sent $282,196, approximately 21 percent, to Furlow-Smiles, and retained the remaining 79%. (PSR ¶ 28).

## III.    Response to Defendant's Objection

Defendant argues that he is entitled to a reduction in his offense level for a minor role.  (PSR ¶ 124).  Under the Sentencing Guidelines, a district court may reduce the offense level of a defendant who is a "minor participant" in the criminal activity by two levels.  U.S.S.G. § 3B1.2(b).  A "minor participant" is one who is "less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2, cmt. n.5.  The proponent of the downward adjustment bears the burden of establishing a minor role in the offense by a preponderance of the evidence.  *United States v. De Varon*, 175 F.3d 930, 939 (11th Cir. 1999).

In making the minor role determination, the district court must first measure the defendant's role against the relevant conduct for which he has been held accountable.  *Id.* at 940.  "Only if the defendant can establish that [he] played a

relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in any larger conspiracy—should the district court grant a downward adjustment for minor role in the offense." *Id.* at 944.

Second, to the extent the record permits, the court may measure the defendant's culpability in comparison to that of other participants in the relevant conduct attributed to the defendant. *Id.* "The conduct of the participants in any larger criminal conspiracy is irrelevant." *Id.* "A defendant is not automatically entitled to a minor role adjustment merely because [he] was somewhat less culpable than the other discernable participants" in his relevant conduct. *Id.* Only if the defendant was less culpable than most other participants in his relevant conduct is the minor role adjustment appropriate. *Id.* Moreover, "[t]he fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." *Id.*

Application Note 3(C) supplies a non-exhaustive list of factors that guide the court's role-in-the-offense analysis under the *De Varon* framework. The Court considers (i) the degree to which the defendant understood the scope and structure of the criminal activity, (ii) the degree to which the defendant

participated in planning or organizing the criminal activity, (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority, (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts, and (v) the degree to which the defendant stood to benefit from the criminal activity. U.S.S.G. § 3B1.2, cmt. n.3(C); *see United States v. Cruickshank*, 837 F.3d 1182, at 1193-94 (11th Cir. 2016) (applying the Application Note 3(C) factors and emphasizing that no single factor is determinative in determining the degree of a defendant's culpability).

Here, Defendant cannot meet his burden.  First, Defendant has only been held responsible for the $1,195,126.07 in loss attributable to his own fraudulent invoices and peer-to-peer payments, not for the $5,147,779 attributable to Furlow-Smiles. (PSR ¶¶ 26, 28, 116).  Second, Defendant cannot establish that he was substantially less culpable than the average participant.  In the scheme, there were at least eight participants: Furlow-Smiles, the Defendant, A.W., A.W., L.F., D.F., J.A. and T.L.

Furlow-Smiles, the organizer and leader, played a more central role than the other participants in the scheme.  (PSR ¶ 26).  The remaining participants, Defendant, A.W., A.W., L.F., D.F., J.A, and T.L., operated in the same capacity; each made a fictitious "contractor" for Facebook and was paid for work never completed.  (PSR ¶¶ 28–33a).  Among these contractor-participants, Defendant was not less culpable.  In fact, he was even more culpable than the other participants.  He received the largest share of fraudulent funds, $1,063,505, compared to $337,622 received by A.W., $211,682 by L.F., $198,880 by A.W., $133,492 by D.F. and $243,695.81 by T.L.  (PSR ¶¶ 28–33a).  He kicked back the largest amount, $282,196, compared to $124,468 by A.W., $51,263 by L.F., and $29,590 by A.W.  (PSR ¶¶ 28–31).  Additionally, Defendant took deliberate steps that the other contractors did not, traveling to Los Angeles and Beverly Hills to make large cash withdrawals from his Titan Branding account to deliver kickback funds to Furlow-Smiles.  (PSR ¶¶ 37–39).  Thus, Defendant cannot show that he was a minor participant in the wire fraud kickback scheme.  Accordingly, this Court should overrule Defendant's objection.

## IV.    Sentencing Recommendation

Congress provided through 18 U.S.C. § 3553(a), the objectives and factors for district courts to consider in imposing a "sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing.  These factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense and to promote respect for the law; (3) the need for adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a)(1)-(7).  The most pertinent § 3553(a) factors in Defendant's case are set forth below.

### 1.    The Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)

This Court should consider Defendant's culpability in this scheme when examining the nature and circumstances of the offense.  Wire fraud schemes are not impulsive crimes.  They require the perpetrator to devise a structure for

moving fraudulent funds, sustain that structure over time, and conceal it from the victim.  Here, Defendant engaged in a deliberate and continuous four-year scheme to defraud Facebook as a willing participant who profited over $1 million from the scheme.  (PSR ¶¶ 28, 34).

Defendant did not stumble into this scheme.  He was a willing participant from the start.  He registered Titan Branding with the Georgia Secretary of State in January 2019 and used it as the corporate vehicle through which he billed Facebook for work he was not, in fact, performing.  (PSR ¶¶ 14, 28, 34).  After Furlow-Smiles initially submitted expenses on Defendant's behalf through her corporate credit cards, Defendant was added directly as a vendor in Facebook's system, allowing him to submit fraudulent invoices on his own behalf at Furlow-Smiles's direction.  (PSR ¶¶ 18, 22, 48, 124).  Once a fraudulent purchase order was approved, Defendant submitted invoices, received payment from Facebook, and kicked back a portion of the proceeds to Furlow-Smiles.  (PSR ¶¶ 23–24).

Defendant benefited substantially from his conduct.  Specifically, of the $1,195,126.07 which reflects Defendant's own fraudulent invoices and peer-to-peer payments he received from Facebook, only $282,196, approximately 21

10

percent, was sent to Furlow-Smiles.  (PSR ¶ 28).  Defendant kept the remaining 79 percent. (PSR ¶ 28).

Defendant exercised meaningful control over how the kickback funds moved. He paid Furlow-Smiles in cash and through electronic transfers, including Zelle. (PSR ¶ 24, 28).  He personally delivered cash kickbacks in person and by FedEx, sometimes wrapping the cash in other items, such as T-shirts and hats, to conceal the contents.  (PSR ¶ 24).  When Furlow-Smiles was in Los Angeles, Defendant flew there with cash and drove with her to ATMs and banks to withdraw additional cash to pay her.  (PSR ¶ 24).  On at least two occasions in early 2020, Defendant traveled to Los Angeles and Beverly Hills to make large cash withdrawals from his Titan Branding account, which were then used to deliver kickback funds to Furlow-Smiles.  (PSR ¶¶ 37–39).  These were not the actions of a passive participant.  They were the actions of a defendant who took deliberate, continuing steps to ensure the success of the scheme.

This Court should also consider the magnitude and duration of the scheme. Defendant participated for approximately four years, received more than 32 fraudulent deposits into his Titan Branding account, and submitted dozens of fraudulent invoices on his own behalf.  (PSR ¶¶ 28, 34).  His conduct caused

Facebook to suffer a loss of $1,195,126.07.  (PSR ¶ 116).  A custodial sentence of 18 months would appropriately reflect the nature and circumstances of this offense and the harm associated with this fraud scheme.

2. **The History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)**

Given that Defendant has no prior criminal history and a criminal history category of I, the Government believes that an 18 months' custodial sentence at the low end of the guideline range fairly reflects Defendant's criminal history and is reasonable and appropriate in this case. (PSR ¶ 134).

3. **The Need to Reflect the Seriousness of the Offense, To Promote Respect for the Rule of Law, and To Provide Just Punishment for the Offense, 18 U.S.C. § 3553(a)(2)(A)**

Wire fraud is a serious offense that causes significant harm to individuals and businesses.  *See United States v. Biltres*, 598 F. App'x 740, 742 (11th Cir. 2015). Corporate procurement systems depend on the integrity of vendors and the truthfulness of invoices.  Companies rely on these systems to ensure that payments are issued only for received goods and services.  Defendant's wire fraud scheme undermines confidence in corporate financial controls and inflicts

significant economic harm, making these offenses especially serious and deserving of meaningful punishment.

The seriousness of this offense is compounded by Defendant's willful decision to persist in the scheme rather than walk away, demonstrating continued disrespect for the law. According to Furlow-Smiles, in 2019 she attempted to stop the kickback arrangement with Defendant, but Defendant told Furlow-Smiles he needed money. (PSR ¶ 109). Furlow-Smiles told Defendant he could keep the fraudulent payments going if he sent kickbacks by cash or Zelle, and Defendant agreed and continued his participation in the scheme. (PSR ¶ 109).

Furthermore, Defendant's prolonged, four-year fraud scheme inflicted significant financial harm to Facebook, reflecting a long-standing disregard for the law that warrants a custodial sentence.

Accordingly, a sentence of 18 months' imprisonment at the low end of the guidelines range would appropriately reflect the serious nature of the offense, promote respect for the law, and provide just punishment for Defendant's conduct.

**4. The Need to Afford Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

In the context of a prosecution for wire fraud and white-collar crime, it is particularly important that the sentence imposed promote general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B); *United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022) ("Congress, the United States Sentencing Commission, and this Court have all decided that general deterrence is a critical factor that must be considered and should play a role in sentencing Defendants, including those who wear white collars.").  Under this factor, the value of the sentence lies in its ability to deter others who may be tempted to engage in similar conduct.  To meet these ends, the Eleventh Circuit has repeatedly recognized and endorsed the ability of adequately firm sentences to send effective deterrent messages, stating: "Defendants in white collar [cases] often calculate the financial gain and risk of loss, and White-Collar Crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

Wire fraud constitutes a constant and significant threat to citizens in the United States.  In the past year, consumers have reported upwards of $12.5 billion in losses to fraud.  *See New FTC Data Show a Big Jump in Reported Losses to Fraud to $12.5 Billion in 2024*, FED. TRADE COMM'N, (Mar. 10, 2025),

14

https://www.ftc.gov/news-events/news/press-releases/2025/03/new-ftc-data-show-big-jump-reported-losses-fraud-125-billion-2024.[1]  Vendors and other trusted outsiders who exploit their relationships with corporate insiders account for a significant share of this problem.  Organizations worldwide lose an estimated five percent of their annual revenue to occupational fraud, totaling approximately $5 trillion in losses each year.[2]

Corruption schemes, which include kickback arrangements like the one at issue here, cause a median loss of $200,000 per case, with such schemes typically lasting twelve months before detection.  Defendant's scheme caused $1,195,126.07 in losses, nearly six times the median loss for corruption schemes, and persisted for nearly four years before being detected.  (PSR ¶¶ 1–2, 25, 34).

---

[1] The significant importance of deterring wire fraud is only increasing.  The number of losses to fraud reported by the Federal Trade Commission in 2024 grew by $2.5 billion from 2023.  *See As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, FED. TRADE COMM'N, (Feb. 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.  Seemingly, potential fraudsters have not been adequately deterred and are growing bolder.

[2] *See* Ass'n of Certified Fraud Exam'rs, *Occupational Fraud 2024: A Report to the Nations* 1, 9–10, 18 (2024), https://legacy.acfe.com/report-to-the-nations/2024/ (reporting global and U.S. occupational-fraud loss data, including median losses for corruption schemes and growth in such losses between 2022 and 2024).

Accordingly, an 18-month custodial sentence and restitution will serve as a clear deterrent, signaling to both Defendant and future offenders that wire fraud schemes carry severe, meaningful consequences.  Companies must be able to trust their vendors and the procurement systems.  That trust cannot be maintained if those who abuse it face minimal punishment.

**V. Conclusion**

For the foregoing reasons, in addition to any arguments the government offers at the sentencing hearing, the Government respectfully requests that the Court impose a custodial sentence of 18 months imprisonment at the low end of the guidelines range and restitution.

May 19, 2026                                          Respectfully submitted,

                                                      THEODORE S. HERTZBERG
                                                          *United States Attorney*


                                                      /s/ *Bernita B. Malloy*
                                                          BERNITA B. MALLOY
                                                              *Assistant United States Attorney*
                                                          Georgia Bar No. 718905
                                                          600 U.S. Courthouse
                                                          75 Ted Turner Drive, SW
                                                          Atlanta, GA 30303
                                                          404-581-6052; Fax: 404-581-6181

### Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Michael Ross

May 19, 2026

/s/ *Bernita B. Malloy*

Bernita B. Malloy
*Assistant United States Attorney*